Schuyler G. Carroll
Alan D. Smith (*pro hac vice pending*)
PERKINS COIE LLP
30 Rockefeller Center, 22nd Floor
New York, NY  10112-0085
Telephone:  212.262.6900
Facsimile:  212.977.1649
Email: scarroll@perkinscoie.com
        adsmith@perkinscoie.com

*Proposed Counsel for Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ADVANCE SCIENCE TECHNOLOGIES, | : Case No. 17-13668 (SMB) |
| INC., and FS-IP LLC, | : |
| | : Joint Administration Requested |
| Debtors. [1] | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DECLARATION OF SEAN SULLIVAN PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY PLEADINGS**

I, Sean Sullivan, declare as follows under penalty of perjury:

1.      This omnibus statement of facts and declaration (this "***Declaration***") is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") in support of the chapter 11 petitions and first-day pleadings of Advance Science Technologies, Inc., an Oregon Corporation, ("***AST***"), and FS-IP LLC, a New York limited liability company ("***FS-IP***") (collectively, "***Debtors***"), in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") filed before on the date hereof (the "***Petition Date***").

2.      I am the Chief Financial Officer, Treasurer, and Executive Vice President of Fortior Solutions, Inc. (the "***Fortior***"). Fortior, which was formerly known as SureID Inc., is the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Science Technologies, Inc. (6977); and FS-IP LLC (5674).  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Debtors' bankruptcy cases.

principal operating company and currently wholly owns the Debtor entities.[2]   I am also a

Director, Vice President and Treasurer of AST, and a Manager, Vice President and Treasurer of

FS-IP.  I first joined the executive management team in 2010 after representing the shareholders'

interests on the Board of Directors from 2005 to 2010.  In addition to oversight of the accounting,

finance, investor relations, procurement, and various operational groups, I work closely with the

executive team and Board of Directors to develop and implement long-range strategic programs,

on external corporate positioning, and to orchestrate new business initiatives.  I have served on

the boards of private companies in diverse industries, including five years as a director of Fortior

Solutions (at the time named Eid Passport, Inc.), where I worked alongside distinguished

business, government, and military leaders.

3.    I am intimately familiar with the Debtors' business and financial affairs.  The

statements set forth below are true to the best of my knowledge and after reasonable inquiry.  If

called to testify to these statements, I could and would do so competently.

## I.    HISTORY OF FORTIOR AND SUMMARY OF PROPOSED RESTRUCTURING

### A.    Fortior Background

4.    Fortior (which recently changed its name from SureID, Inc.) was founded in

November 2001 as an Oregon corporation under the name of Eid, Inc.  Fortior developed its

primary product, the RAPIDGate® Program, a high-assurance identity and access control

solution, to  help the U.S. military, critical infrastructure and other security-focused organizations

register, identity proof, background screen, credential and manage the access privileges of

vendors and contractors  requiring access to secured facilities.   Fortior won its first military

RAPIDGate customer in 2004 and by the end of 2016 had operations at every U.S. Navy and

Marine Corps base in the continental United States, Hawaii and Guam, plus 24 U.S. Army

facilities and 15 U.S. Coast Guard facilities.   As of April 2017, prior to the Navy abruptly

---

[2]  Between October 2003 and August 2015, SureID was known as Eid Passport, Inc.  Prior to that, SureID
conducted business as Eid Access, Inc. (April 2002-October 2003), and Eid, Inc. (November 2001 – April
2002).

cancelling Fortior's certification to do business on Navy sites (as described below), the Navy was by far the largest of Fortior's customers, comprising approximately 70% of Fortior's $57 million in annual sales.

5.      From 2004 to 2011, Fortior grew its RAPIDGate business, slowly at first, then increasingly rapidly.  In 2012 through 2013, as Fortior's subscriber-based RAPIDGate business model began to reach critical mass and sustained cash flows, Fortior's management and Board of Directors, in consultation with its largest shareholders, made a strategic decision to diversify its product mix and to expand the target market into the broad and very large commercial and consumer identity verticals.  The strategic growth plan developed in the subsequent years focused Fortior's vision broadly on high-assurance identity rather than only access control.  In 2012, Fortior moved to its current headquarters building in Hillsboro, Oregon.

6.      In 2015, Fortior engaged Deloitte Corporate Finance ("*Deloitte*") to help develop a long-term financing strategy.  The first phase would be to provide additional growth capital, in the form of a $25 million senior secured debt facility.  The next phase would be to secure equity financing.  In November 2015, Fortior entered into a loan agreement with Goldman Sachs Specialty Lending Group, L.P., as Administrative Agent for various lenders (the "*Senior Secured Lenders*" and Goldman Sachs Specialty Lending Group, L.P., acting in its capacity as Administrative Agent for the Senior Secured Lenders, the "*Secured Lender*"), to provide Fortior with funding for growth, product development and operating purposes (the "*Senior Secured Loan*").  As collateral for the Senior Secured Loan, the Secured Lender was granted a lien on all of the property and assets (both tangible and intangible) of Fortior and its subsidiaries.  Also in 2015, as a part of a rebranding effort to better reflect its focus on identity, in addition to its traditional business of access control, Fortior changed its name from Eid Passport, Inc. to SureID, Inc.

7.      Fortior's development activities focused upon three principal commercial product areas:   consumer-friendly and convenient electronic fingerprint capture to facilitate FBI fingerprint-based criminal history records checks (target users would include individuals who are

required to obtain a copy of their own record in order to work or volunteer in certain regulated industries); vendor management solutions such as identity proofing and vetting for large organizations that require high-assurance access control; and the production and issuance of high-security, cryptographic PIV-I (Personal Identity Verification Interoperable) credentials. Primarily due to its Navy business, Fortior had issued more than 200,000 PIV-I credentials since 2014, making it among the largest, if not the largest, issuer of such credentials in the world. Fortior sought to grow its PIV-I business outside of the military.

8.      A key element of Fortior's diversification and growth approach was to promote high-assurance identity through in-person identity registration and verification.   In 2016, this philosophy, along with the strategy to target FBI fingerprinting business, consumer customers and national commercial customers, led Fortior to establish an arrangement with a major national retail company to deploy a nationwide network of high-assurance registration kiosks. By mid-2107, Fortior had shipped its proprietary registration kiosks to approximately 800 stores across the country, with at least one in each state.

**B.      Events Precipitating Bankruptcy Filings**

9.      The Senior Secured Loan was in place for more than a year when in mid-April 2017, Fortior's largest customer, the Navy, suddenly and unexpectedly, with just several days' notice, notified Fortior that it was terminating its certification that permitted Fortior to provide its RAPIDGate® program services at Navy facilities, and instead would be in-sourcing vendor identity and credentialing services to the Government.   The Navy took this action despite the fact that the Navy appeared to have been highly satisfied with the RAPIDGate program:  (a) only three months earlier, the Navy had issued an extension of Fortior's CCS certification through February 2, 2018, and (b) the Navy emphasized in its notification to Fortior that its decision to in-source services to the Government was "in no way a reflection on SureID." Fortior took immediate steps to try to reverse the Navy's decision, and Management spent much of the next several months in an unsuccessful attempt to revive the Navy business.   The Navy's

action quickly led to a precipitous drop in RAPIDGate revenue, which ultimately resulted in a loss of approximately $3 million per month of operating revenue.

10.     In addition to the significant loss of revenue, the Navy's action also triggered an Event of Default under the Senior Secured Loan.  The Navy's action also rendered infeasible a proposed broad equity financing being led by Fortior's financial advisors, and resulted in the loss of a promising acquisition of a fingerprinting company that Fortior had anticipated would add to Fortior's capabilities, help diversify its revenue sources and increase its sales.

11.     After receiving the Navy's notification, Fortior began taking immediate steps to try to mitigate the impact to Fortior and its shareholders.  These actions included making significant cuts in expenditures and further reductions in overall spending.  Because payroll accounted for a substantial portion of Fortior's fixed recurring expenses, Fortior made significant headcount reductions beginning in the second quarter of 2017, laying off more than 400 employees through November 2017.  Headcount reductions were made at all levels, including virtually all vice presidents and two senior members of executive management, Fortior's Chief Information Officer and its Chief Marketing Officer.  In addition, Fortior's Chief Executive Officer stepped aside on May 31, 2017, leaving Fortior with only three executive officers, and the Board appointed Fortior's long-time President and Chief Operating Officer, James (Jim) Robell, as his replacement.

12.     Fortior's financial advisor, Deloitte, was also directed to change its financing tactics and proceeded to approach more than 200 potential investment sources, ranging from special situation investors to lenders to strategic acquirers.  Fortior held more than one dozen in-depth management presentations with potential financial sponsors and strategic investors.

## C.      Pre-bankruptcy Restructuring

13.     In October 2017, Fortior sold its "SureID" commercial business, including the "SureID" and "Eid" names, to STS SID LLC ("*Sterling*"), a wholly-owned subsidiary of Sterling Infosystems, Inc., d/b/a Sterling Talent Solutions, for approximately $6.6 million. The

Merchant Banking Division of Goldman Sachs ("**MBD**") holds a significant equity position in Sterling through its balance sheet and/or funds or accounts managed by MBD.  MBD is separated from the Securities Division of Goldman Sachs (including the Secured Lender) through customary information barriers.  Although Fortior retained the assets related to its government and related critical infrastructure business (the "***Government and Critical Infrastructure Assets***") (aside from Fortior's FBI Fingerprint Channeler business, subject to the Government's consent) and certain other assets related to that business (the "***Other Business Assets***"), the transaction with Sterling includes a five-year agreement not to compete in areas outside of the government and certain critical infrastructure sectors.  Fortior also estimated in mid-October 2017 that as of December 31, 2016, it had approximately $86 million of U.S. federal net operating losses or "NOLs," which provide the potential for future tax savings (together with the Other Business Assets and the Government and Critical Infrastructure Assets, the "***Assets***").

14.    Because the Secured Lender had a lien on all of the property and assets that were sold to Sterling, all of the net proceeds generated by the asset sale to Sterling were applied against Fortior's obligations under the Senior Secured Loan.   Concurrently with the closing of that transaction, however, the Secured Lender agreed to establish a working capital facility for Fortior in the amount of up to $5 million.

15.    Although the Secured Lender has continued to provide funding to Fortior in order to help facilitate an orderly restructuring of Fortior's business and related obligations, Fortior continues to be in default under the Senior Secured Loan.  If the Secured Lender chose to do so, the Secured Lender could cease providing funding and foreclose on the Senior Secured Loan. As of November 30, 2017, approximately $57.9 million is owed under the Senior Secured Loan.

16.    Based on Fortior's most recent estimate, and the evidence gathered in the recent marketing efforts led by Deloitte, the current value of Fortior's remaining business is substantially less than the amount payable to the Secured Lender under the Senior Secured Loan.  As a result, if the Secured Lender determines to foreclose on Fortior, sell all of Fortior's

assets, and apply the proceeds against the remaining balance of the debt, Fortior anticipates there would be no remaining assets available for distribution to the unsecured creditors or shareholders.

### D.    Proposed Bankruptcy Restructuring

17.    Instead, Fortior's management and the Board of Directors, along with its largest equity investor and the Secured Lender, have spent the past several months developing a plan to restructure Fortior.   The overall goals are to (a) maintain the government RAPIDGate business, (b) decrease Fortior's operating debt, (c) provide the existing shareholders an opportunity to maintain ownership in Fortior and the prospect of eventually realizing some return on invested capital, and (d) maximize the Secured Lender's return of principal.   The restructured Fortior will continue to pursue government and certain critical infrastructure business and changed its name from SureID, Inc. to Fortior Solutions, Inc. just prior to the commencement of the bankruptcy proceedings.   As explained in greater detail below, as a result of the proposed restructuring (i) certain assets of Fortior (other than government and critical infrastructure assets) will be transferred to and owned by AST, which will become wholly-owned by the Secured Lender Affiliate Shareholders (as defined below) and/or their affiliates; and (ii) all of the government and critical infrastructure assets will continue to be owned by Fortior, and Fortior will be owned indirectly (a) 75% by FS Holdings, and thus by Fortior's existing shareholders (other than the Secured Lender Affiliate Shareholders) (less up to 10% by Fortior's management team (and potentially other service providers) as non-voting Class P Incentive Units (as defined below) (treated as profits interest for tax purposes) pursuant to a long-term incentive plan (the "*LTIP*")); and (b) 25% by AST.  On or about December 4, 2017, Goldman, Sachs & Co., LLC, an affiliate of the Secured Lender, notified Fortior of its irrevocable exercise of its penny warrants with respect to (a) 2,608,466 shares of voting common stock, (b) 111,111 shares of non-voting common stock, (c) 1,059,352 shares of Series A Preferred Stock and (d) 900,448 shares of Series B Preferred Stock, equal to 10% of each outstanding class and series of Fortior's shares, which shares may be transferred to and among the affiliates of the Secured Lender (each such

affiliate, including Goldman, Sachs & Co., LLC, a "***Secured Lender Affiliate Shareholder***"). Prior to the filing of the chapter 11 proceeding, Goldman, Sachs & Co., LLC transferred all such shares to its affiliate, Goldman Sachs Specialty Lending Holdings, Inc.

18.    The proposed restructuring will be effected through these Chapter 11 cases of AST and FS-IP, wholly-owned subsidiaries of Fortior.   Fortior, which is the principal operating company, will not be a chapter 11 debtor, but will be a proponent of the Debtors' Plan.

19.    Since early May, 2017, the Board and Fortior's management have been working diligently to avoid foreclosure by the Secured Lender on the Senior Secured Loan, and, in close consultation with Fortior's legal advisors, have negotiated the terms of the consensual restructuring now being proposed.   The Board and Fortior's management believe that the proposed restructuring presents the most likely, if not only, means to preserve value for shareholders, and best serves all of Fortior's stakeholders.

20.    On December 5, 2017, notice of a special shareholders meeting was sent to all Fortior shareholders for a meeting to be held on December 27, 2017.  Each shareholder received an Information and Disclosure Statement ("***Disclosure Statement***"), which described the restructuring and various other corporate documents. An informational webinar was offered to shareholders on December 15, 2017. A copy of the Disclosure Statement will be filed with the bankruptcy court, in support of the *Debtors' Joint Prepackaged Plan of Reorganization* (the "***Plan***").

21.    On December 27, 2017, at the special shareholder meeting the shareholders voted overwhelmingly to approve the restructuring transactions contemplated in the Disclosure Statement, as well as the commencement of the Chapter 11 cases and confirmation of the Plan.

136070309.12

## II.   SUMMARY OF CURRENT ORGANIZATION AND INITIAL RESTRUCTURING STEPS

22.     Fortior currently has four direct wholly-owned subsidiaries, each of which owns a relatively small amount of assets:  AST and FS-IP (the Debtors in these chapter 11 cases), as well as Fortior Solutions Holdings, Inc., an Oregon corporation ("*FS Holdings*"), and  FS-IS, LLC, an Oregon limited liability company ("*FS-IS*").  In addition, AST wholly owns FS MergerSub, Inc., an Oregon corporation ("*MergerSub")*, and FS-IS wholly owns FSIHC, LLC, an  Oregon limited liability company ("*FSIHC*").   Most of the various direct and indirect subsidiaries of Fortior were formed to facilitate the restructuring.



23.     The Secured Lender Affiliate Shareholders currently own 10% of the fully diluted capital stock of Fortior, and Fortior's other shareholders currently own the remaining 90%.  A large number of individuals hold options to purchase common stock in Fortior and there is also one outstanding warrant to purchase shares of common stock.  Consequently, on a fully diluted basis, Fortior's current shareholders (other than the Secured Lender Affiliate Shareholders) own approximately 57% of Fortior's fully diluted capital stock.

24.     As an initial step in the restructuring, Fortior transferred certain assets not core to Fortior's government business (the "*Business Assets*") to FS-IP.  These assets included certain credentialing assets, as well as certain facial recognition and block chain technology and other

intellectual property rights. While those assets will ultimately be owned by AST following the restructuring (which in turn will be wholly-owned by the Secured Lender Affiliate Shareholders and/or their affiliates), and subject to terms and provisions of a Contribution, Assumption and Assignment Agreement, AST granted to Fortior, and Fortior retained, a non-exclusive, sub-licensable, perpetual, irrevocable, worldwide, royalty-free license to make, have made, reproduce, use, modify, display, create derivative works, sell and otherwise exploit the intellectual property rights transferred to FS-IP.

25.    Fortior will remain the operating company, but it will not be a debtor in the bankruptcy; rather it will continue to operate its business outside of the bankruptcy process and except for the restructuring of the Senior Secured Loan (as described above and below) Fortior's obligations to its trade and other creditors will continue in effect. Additionally, none of FS Holdings, FS-IS or FSIHC will be filing bankruptcy petitions.

## A.    The Step One Merger

26.    In step one of the Post-Petition Reorganization, MergerSub will be merged with and into Fortior, with Fortior being the surviving corporation (the "***Step One Merger***") pursuant to the Agreement and Plan of Merger, attached to the Disclosure Statement as Exhibit J (the "***Step One Merger Agreement***"). Immediately following the Step One Merger, Fortior will become a wholly-owned subsidiary of AST and all outstanding shares of preferred and common stock of Fortior, as well as all outstanding options and warrants, will be automatically deemed to be exchanged on a one-for-one basis into an equal number of shares of preferred stock, common stock, options and warrants in AST, having substantially the same rights, preferences and privileges as those shares of stock, options and warrants had in Fortior. The Step One Merger Agreement contemplates that AST's shares of preferred and common stock will be deemed to be distributed to the current shareholders of Fortior (other than Dissenting Shares (as defined in Part IX of the Disclosure Statement, "***Appraisal Rights***"), if any) in reliance on the exemption from the Securities Act and Blue Sky Laws registration requirements provided by section 1145(a) of

the Bankruptcy Code.   The Secured Lender Affiliate Shareholders, who presently own approximately 10% of each class of capital stock of Fortior, will receive the shares of AST to which they are entitled as current shareholders of Fortior and will forego their rights to exchange shares of AST for shares of FS Holdings as described below.



27.   The articles of incorporation and bylaws of AST will be substantially identical to Fortior's existing articles of incorporation and bylaws, and the officers and directors will be substantially the same as the existing officers and directors of Fortior.   Immediately after the Step One Merger is completed, Fortior will be converted from an Oregon corporation into an Oregon limited liability company.   Among other things, this change will result in Fortior being treated as a "disregarded entity" for tax purposes, which will result in AST succeeding to certain of the Assets, including the NOLs for tax purposes.

136070309.12

**B.    Step Two – Transfer of Minority Ownership of Fortior and Ownership of AST to the Secured Lender**

28.    After completion of the Step One Merger, AST will exchange its 100% ownership of Fortior for all of the equity interests in FS-IP, FS Holdings and FS-IS, and 100% of the membership interests in Fortior will then be contributed to FSIHC, such that Fortior will remain an indirect wholly-owned subsidiary of AST, with two intermediate wholly-owned subsidiaries in between – FS-IS and FSIHC.



29.    Subject to the receipt of the approval of the Bankruptcy Court, 75% of the membership interests in FSIHC (subject to the LTIP rights) will be transferred to FS Holdings,

136070309.12

and the remaining 25% will be held by the Secured Lender Affiliate Shareholders and/or their affiliates through ownership of AST. Each Secured Lender Affiliate Shareholder will forego its right to exchange its shares of AST for shares of FS Holdings, and AST will assume all but $20 million in principal of Fortior's outstanding Senior Secured Loan obligations, and Fortior's other shareholders will be deemed to have exchanged all of their shares of AST capital stock on a one-for-one basis for an equivalent number and type of shares of preferred stock and/or common stock, as the case may be, of FS Holdings. As a result, after the restructuring is completed (a) Fortior's current shareholders (other than the Secured Lender Affiliate Shareholders) will own 100% of the outstanding shares of FS Holdings, which will own indirectly 75% of FSIHC (subject to the LTIP), which will own 100% of Fortior (which will retain the Government and Critical Infrastructure Assets), and (b) the Secured Lender Affiliate Shareholders and/or their affiliates will own 100% of the outstanding shares of AST, which will own 25% of FSIHC (and therefore, indirectly, 25% of Fortior), as well as certain assets of Fortior not necessary for thegovernment and critical infrastructure business. As noted previously, up to 10% of the equity in FSIHC will be reserved for issuance as non-voting Class P Incentive Units under the LTIP for Fortior's management (and potentially other service providers), with amounts payable in respect of such Class P Incentive Units to be deducted from amounts payable to FS Holdings in respect of its membership units in FSIHC (the corporate structure of FSIHC and related rights of the members are described in Part II of the Disclosure Statement).

30.    As described above, FSIHC will have three classes of membership units, Class A common membership units, Class B common membership units and Class P Incentive Units. Fortior's current shareholders (other than the Secured Lender Affiliate Shareholders), through FS Holdings, will own 100% of the Class A common membership units, the Secured Lender Affiliate Shareholders and/or their affiliates, through AST, will own 100% of the Class B common membership units, and the Class P Incentive Units (up to 10% of the equity of FSIHC) will be reserved for issuance under the LTIP.



## C.    Treatment of Creditors and Interest Holders Under the Plan

31.    As is described in more detail below, there are only two classes of creditors and interest holders whose rights are being affected by the Plan – the Senior Secured Lenders and Fortior itself, as the shareholder of the Debtors.

32.    Under the Plan, Fortior will become a wholly-owned subsidiary of FSIHC, as described above.    Fortior's current shareholders (other than the Secured Lender Affiliate Shareholders) will have the shares of preferred stock and common stock that they held in Fortior (and then AST) cancelled in exchange for the deemed issuance on a one-for-one basis of an equal number of shares of preferred stock and/or common stock, as the case may be, of AST (and then for shares of FS Holdings), having substantially the same rights, preferences and privileges as those shares of stock had in both Fortior and AST.   The shareholders (other than the Secured Lender Affiliate Shareholders) will hold 75% of the ultimate equity interest of Fortior, subject to the LTIP (See "Your Ownership Following the Post-Petition Reorganization - *Long Term Incentive Plan*" in the Disclosure Statement).

136070309.12

33.     As discussed in more detail in Part II of the Disclosure Statement, the Senior Secured Loan – currently a joint and several obligation of Fortior and the Debtors – will be divided into two separate components.  $20 million in principal of the Senior Secured Loan will remain outstanding against Fortior, and will be guaranteed by Fortior's direct parent, the new intermediate holding company FSIHC.   FSIHC's 100% equity interest in Fortior will be pledged to the Secured Lender, as Agent for the benefit of the holders of the Senior Secured Loan.

34.     Each Secured Lender Affiliate Shareholder will receive shares of AST corresponding to the shares of Fortior it holds prior to the Post-Petition Reorganization and will forego its right to  exchange its shares of AST for shares of FS Holdings and the Secured Lender Affiliate Shareholders  and/or their affiliates will end up with ownership of all of the Equity Interests in AST, along with all of the assets that AST will own as a result of the proposed restructuring, including indirectly, 25% of the ultimate ownership of Fortior.  (See Part II of the Disclosure Statement)

35.     The remainder of the Senior Secured Loan will be assumed by AST.   The current shareholders of Fortior (other than the Secured Lender Affiliate Shareholders), will be deemed to have exchanged all of their shares of AST capital stock on a one-for-one basis for an equivalent number and type of shares of preferred stock and/or common stock, as the case may be, of FS Holdings, with each Secured Lender Affiliate Shareholder retaining its stock in AST, and therefore  100% ownership in AST.   A portion of the debt assumed by AST will be canceled for equity of AST and/or contributed to the capital of AST, as elected by the Secured Lender. AST will then own 25% of FSIHC (and therefore, indirectly, 25% of Fortior), and the remaining 75% of FSIHC will be owned by FS Holdings (and therefore indirectly by Fortior's current shareholders (other than the Secured Lender Affiliate Shareholders)).   As noted above, an amount of up to 10% of the equity in FSIHC will be reserved for issuance as non-voting Class P Incentive Units under the LTIP for Fortior's management (and potentially other service

providers), with amounts payable in respect of such Class P Incentive Units to be deducted from amounts payable to FS Holdings in respect of its membership units in FSIHC.

36.     All other creditors will be unimpaired under the Plan.   Fortior and the Debtors do not believe the Debtors will have any creditors or interest holders other than the Senior Secured Lenders and Fortior.  To the extent the Debtors do have any other creditors, any claims of such other creditors will not be impaired under the Plan.

37.     There are protective provisions in the Plan for determination of disputed claims, distributions, and the like, but those provisions are not anticipated to be used.  Accordingly, the Plan will not affect the creditors of Fortior.  Creditors of Fortior will retain their claims, and all other rights, against Fortior.

**D.    Voting on the Plan**

38.     Under the proposed Plan, the only classes that are impaired are the Senior Secured Lenders and Fortior, as shareholder of AST and FS-IP.  Accordingly, only those two classes are entitled to vote on the Plan.

39.     The Senior Secured Lenders, Fortior, FSIHC, FS Holdings and the Debtors are parties to a *Restructuring Support Agreement* (attached as Exhibit L to the Disclosure Statement) that commits them to support and to vote for the Plan except under the limited circumstances noted in the Restructuring Support Agreement.  In addition, the Senior Secured Lenders and Fortior each cast a ballot voting in favor of the Plan prior to the Petition Date.  Accordingly, no post-petition solicitation is required.

40.     The votes of Fortior's shareholders were nonetheless solicited via the Disclosure Statement in accordance with Oregon corporate law, in order to obtain approval of all of the corporate and other restructuring matters described therein.   While Fortior and the Debtors do not believe the votes of the shareholders are required for bankruptcy purposes, they believe the Disclosure Statement satisfies all Bankruptcy Code requirements for solicitation, were such satisfaction necessary.  Fortior's shareholders overwhelmingly approved the proposed Plan at a

shareholders meeting held on December 27, 2017, consistent with Fortior's amended and restated articles and bylaws.

## III.   FIRST-DAY MOTIONS[3]

41.     This Declaration is submitted in support of the following contemporaneously-filed first-day motions.   In order to ensure a smooth transition of the Debtors' business operations into chapter 11, the Debtors have requested various types of relief in the first-day motions.   A summary of the relief sought in each first-day motion, as well as the factual basis for each first-day motion, is set forth below.

42.     I have reviewed each of these first-day motions, including the exhibits and schedules thereto.   The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the first-day motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations, and (ii) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.     Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Order Directing Joint Administration of Related Chapter 11 Cases ("*Joint Administration Motion*")**

43.     Through this motion, the Debtors request entry of an order (i) directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), (ii) providing that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Advance Science Technologies, Inc., and (iii) granting authority to file a single monthly operating report on a consolidating (not consolidated) basis.

44.     I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.   Here, AST and FS-IP are both wholly-owned subsidiaries of Fortior and share the same management. In addition, pursuant to the Plan, FS-IP will merge with and into AST, with AST as the surviving

---

[3]  Capitalized terms used but not otherwise defined in this Section retain the definition given to them in the applicable first-day motion.

entity.  Accordingly, I understand that the Debtors in these Chapter 11 Cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.

45.     Joint administration of Debtors' cases will reduce fees and costs by avoiding the expense of requesting Court approval of identical motions involving the same parties in each of the separate cases (such as all "first-day" motions).  Joint administration of these cases also will (i) ease the administrative burden for the Court and the parties by avoiding duplicative filings, objections, notices and hearings, (ii) allow the Office of the U.S. Trustee and other interested parties to efficiently monitor the cases, (iii) protect creditors of Debtors' estates against potential conflicts of interest.  Creditors of the estates will be aware of the cash collateral and financing requests and the relationships between the Debtors, their cases, their assets and their liabilities.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

**B.      Debtors' Motion for Order (I) Establishing Confirmation Schedule, Including Combining Hearing to Consider (A) Approval of Disclosure Statement, (B) Approval of Solicitation Procedures, and (C) Confirmation of Prepackaged Chapter 11 Plan; and (II) Extending Time and, Subject to Confirmation, Waiving Requirements Regarding (A) Section 341 Meeting and (B) Schedules and Statement of Financial Affairs**

46.     Through this motion, the Debtors request that the Court establish a schedule for confirmation of the Debtors' Plan, along with related relief.  In addition, the Debtors request that the Court extend the time to schedule and hold a Section 341 meeting and the time to file schedules and statements of financial affairs, and, if the Plan is confirmed, waiving such requirements.

47.     At a special shareholders' meeting held on December 27, 2017, the Fortior shareholders overwhelmingly approved the corporate transactions contemplated by the Plan, approved the filing of these bankruptcy cases, and authorized Fortior's officers and directors to move forward with filing and consummation of the Plan.

48.     The Debtors were not operating entities prior to the filing of these Chapter 11 Cases, and the Debtors do not believe there are any other creditors or stakeholders.

49.     The Debtors believe that they have complied with both bankruptcy law and with applicable non-bankruptcy law in pursuit of the RSA and the Plan.

50.     There are only two impaired classes under the Plan – Class 3 (Senior Secured Lenders) and Class 6 (Interests – Fortior).  All members of both impaired classes are parties to the RSA and have returned ballots in favor of the Plan

51.     The Debtors do not believe that publication is necessary or appropriate under the circumstances of this case and therefore, do not propose to publish the Hearing Notice in any publications of general circulation or otherwise.

52.     A Combined Hearing in this case will promote judicial economy and will allow the Debtors most expeditiously to effectuate their and their affiliates' restructuring, thus maximizing value for the entire enterprise and all stakeholders.

**C.     Debtors' Motion for Interim and Final Orders Pursuant to Sections 105(A), 362(A)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001 establishing Notice and Hearing Procedures for Trading of the Beneficial Ownership of Related Party Equity Securities ("*Stock Transfer Motion*")**

53.     Through this motion, the Debtors seek interim and final orders establishing notice and hearing procedures that must be satisfied before certain transfers of the beneficial ownership of equity securities in the Debtors' non-debtor parent entity Fortior Solutions, Inc. (f/k/a SureID, Inc.) ("*Fortior*") and in AST are deemed effective. This motion seeks immediate entry of an interim order and is brought on an emergency basis to avoid immediate and irreparable harm to the Debtors' estates.

54.     A significant portion of the value of the Debtors on a reorganized basis is attributable to the potential future use of Fortior's NOLs and Tax Attributes (both defined below).

55.    The transfer restrictions contemplated under the Stock Transfer Motion are consistent with the transfer restrictions that were expressly voted on, and approved by, Fortior's shareholders in conjunction with approval of the RSA.

56.    The procedures for trading the beneficial ownership of Fortior's or AST's equity securities set forth in the Stock Transfer Motion are necessary to protect and preserve the value of U.S. federal and state tax attributes, including but not limited to, net operating loss carryforwards ("*NOLs*" and, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the "*Tax Attributes*"). It is estimated that Fortior has federal NOLs of approximately $86 million that are available to offset future taxable income.

57.    As of the Petition Date, Fortior had approximately (i) 26,084,660 voting common shares, (ii) 10,593,520 preferred series A shares, (iii) 9,004,480 preferred series B shares, and (iv) 1,111,110 nonvoting common shares outstanding.  Under the Debtors' prepackaged Plan, there will be a change in ownership percentages for Fortior. Under the Plan, equity of Fortior will effectively be held by (a) the current shareholders of Fortior, (b) the Lenders and (c) Fortior's management team, with the Lenders effectively owning 25% of the equity interests in Fortior and Fortior's shareholders effectively owning the remaining balance. Up to 10% of that remaining balance of shares will be available for issuance to Fortior's senior management team and certain other key employees as non-voting incentive units pursuant to a long-term equity incentive plan.

58.    Without trading restrictions on Fortior's and AST's equity securities, the ability to use Fortior's Tax Attributes could be reduced or eliminated, which could lead to significant negative consequences for the Debtors, their estates, creditors, stakeholders, and other parties in interest. To preserve, to the fullest extent possible, the flexibility to maximize the use of the Tax Attributes, the Debtors seek limited relief that will enable the Debtors to closely monitor certain transfers of the beneficial ownership of Fortior's and AST's equity securities, so as to be in a position to act expeditiously if necessary to preserve their Tax Attributes.

136070309.12

59.     Fortior's Tax Attributes are valuable to the Debtors' estates because after confirmation they may be beneficial to reorganized AST, to be owned by the Senior Secured Lenders and their affiliates. This is one of the results of the negotiations leading to the prepackaged Plan; in exchange, among other things most of the ultimate equity ownership of Fortior will remain in the hands of Fortior's current equity holders.

**D.     Emergency Motion for Interim and Final Orders Under Sections 105, 361. 362, 363 And 507 of the Bankruptcy Code (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief; and (IV) Scheduling a Final Hearing ("*Cash Collateral Motion*")**

60.     Through this motion, the Debtors seek entry of an interim and final orders authorizing the Debtors, among other things, to use cash collateral pursuant to the terms of the stipulated Cash Collateral Orders. Under the terms of the Cash Collateral Orders, Goldman Sachs Specialty Lending Group, L.P., as agent (the "*Agent*") for certain lenders (each an "*Lender*") party to the Debtors' prepetition credit agreement, consents to the Debtors' use of cash collateral subject to the terms and conditions of the Cash Collateral Orders.

61.     The Debtors and their advisors undertook a fulsome evaluation of various potential strategic alternatives. Based on the projected operating performance of the business and the challenging industry landscape, the Debtors and advisors concluded a refinancing or sale of the Debtors at a level that would exceed the Debtors' debt levels was unlikely.

62.     At the direction of the Debtors' board, the Debtors conducted an investigation into potential claims and causes of action against the Lenders, including the possibility of deficiencies in grant, attachment, or perfection of the Lenders' security interests.  That investigation revealed no such deficiencies.

63.     The Debtors stand to lose significant value in the event it is denied access to continued use of cash collateral. Without the ability to obtain access to the Lenders' cash collateral, the Debtors would be unable to meet their postpetition obligations, thus causing irreparable harm to the value of the Debtors' estates.

**E.     Debtors' Motion For an Order (A) Authorizing the Debtors to Assume Restructuring Support Agreement and (B) Granting Related Relief ("*RSA Motion*")**

64.     Through this motion, the Debtors seek entry of an order (a) authorizing the Debtors to assume the *Restructuring Support Agreement* (the "***Restructuring Support Agreement***" or "***RSA***"), by and among (i) SureID, Inc. ("***SureID***"), (ii) the Debtors, (iii) FS Merger Sub, Inc. ("***Merger Sub***"), (iv) FSIHC, LLC ("***FSIHC***"), (v) FS-IS LLC ("***FS-IS***"), (vi) Fortior Solutions Holdings, Inc. ("***FS Holdings***"; together with SureID, the Debtors, Merger Sub, FS-IS, and FSIHC, the "***Companies***" and each a "***Company***"), (viii) each lender (each a "***Lender***") party to the Credit Agreement (defined below) and (ix) Goldman Sachs Specialty Lending Group, L.P., as administrative agent for the Lenders (in such capacity, "***Administrative Agent***"); and (b) granting related relief.

65.     The comprehensive and prepackaged restructuring contemplated in the RSA is the best and most value-maximizing path for the Debtors, their estates, and key stakeholders.  The RSA ensures stakeholders support for a series of transactions which avoid foreclosure by the Lenders, permit the underlying government contract business to continue uninterrupted, significantly reduce amounts owed under the Credit Agreement, and preserve value for all stakeholders, including shareholders of the Debtors and shareholders of the Debtors' affiliates.

66.     Assumption of the RSA will provide important structure and stability to these Chapter 11 Cases by ensuring the support of the Debtors' key stakeholders and a framework for the confirmation and consummation of the Plan.  The RSA is the byproduct of arm's-length negotiations between the Companies and the Administrative Agent.

67.     The obligation to pay Transaction Expenses set forth in Section 13 of the RSA was bargained for and an integral part of the RSA.  Without the benefit of Section 13 of the RSA, the Administrative Agent and Lenders would not have agreed to the terms and conditions of the RSA.

F.    **Application to Employ Perkins Coie LLP as Counsel for the Debtors-In-Possession** *Nunc Pro Tunc* **to Petition Date ("*Perkins Application*")**

68.    Through this application, the Debtors seek authorization to employ Perkins Coie LLP as the Debtors' bankruptcy counsel in these Chapter 11 Cases.

69.    Perkins Coie has obtained a detailed and extensive familiarity with the Debtors' businesses, capital structure, and financial affairs through its representation for over ten years of the Debtors' non-debtor parent entity Fortior Solutions, Inc., formerly known as SureID, Inc. ("*Fortior*").

70.    The Debtors engaged Perkins Coie to serve as general bankruptcy counsel in connection with the planning and implementation of these chapter 11 cases in light of Perkins Coie's extensive expertise in complex Chapter 11 reorganizations.

71.    To the best of the Debtors' knowledge, information, and belief, based on and other than as set forth in the Smith Declaration:

(a)    Perkins Coie does not hold or represent an interest adverse to the Debtors' estates and is a "disinterested person," as that term is defined in Bankruptcy Code § 101(14) and modified by § 1107(b), with respect to the matters for which Perkins Coie is to be employed;

(b)    Except for the "Connections" set forth in the Smith Declaration, no Perkins Coie partner, counsel, or associate has any connection with the Debtors, its creditors, its estate, any United States District Judge or United States Bankruptcy Judge for the Southern District of New York, the U.S. Trustee or any person employed in the office of the U.S. Trustee for Region 2, or any other party-in-interest, or their respective attorneys and accountants; and

(c)    The disclosures made by Perkins Coie in the Smith Declaration (regarding connections with the Debtors, their creditors, any other parties-in-interest in these cases, their respective attorneys and accountants, any U.S. District Judge or U.S. Bankruptcy Judge for the

Southern District of New York, the U.S. Trustee or any person employed in the office of the U.S. Trustee for Region 2) satisfies the requirements of Bankruptcy Rule 2014.

72.    The Debtors seek to employ Perkins Coie on an hourly basis at rates consistent with those Perkins Coie routinely charges in comparable matters and consistent with the rates Perkins Coie charged the Debtors and non-debtor affiliates prepetition.

73.    Other than as set forth in the Perkins Application, no arrangement is proposed between the Debtors and Perkins Coie for compensation to be paid in these chapter 11 cases.

74.    The Debtors believe that the fee structure is both fair and reasonable.

75.    The Debtors believe that Perkins Coie is well qualified to represent the Debtors effectively and efficiently in these chapter 11 cases. Perkins Coie's resources, capabilities, and experience in advising the Debtors are crucial to the Debtors' successful restructuring.  The Debtors believe that employing Perkins Coie is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

## IV.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

76.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

77.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

78.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' twenty (20) largest unsecured claims on a consolidated basis, excluding claims of insiders.

79.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

136070309.12

80.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

81.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information:  the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

82.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

83.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

84.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

85.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

86.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

87.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors,

stockholders, and partners) and the estimated amount to be paid to the Debtors' officers, stockholders, and directors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases.

88.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

This declaration describes the factors that have precipitated the commencement of these Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the first-day pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.


Dated:  December 29, 2017

/s/ Sean Sullivan
Sean Sullivan
Chief Financial Officer, Treasurer, & Executive Vice President of Fortior Solutions, Inc.
Manager, Vice President & Treasurer of Advance Science Technologies, Inc.
Director, Vice President and Treasurer of FS-IP, LLC

**<u>Schedule 1</u>**

**Local Rule 1007-2(a)(3):  Committees**

To the best of the Debtors' knowledge and belief, no committee has been organized prior to the Petition Date.

**<u>Schedule 2</u>**

**Local Rule 1007-2(a)(4):  Consolidated List of 20 Largest Unsecured Claims (Excluding Insiders)**

To the best of the Debtors' knowledge and belief, the Debtors do not have any unsecured creditors.

## Schedule 3

**Local Rule 1007-2(a)(5):  Consolidated List of Holders of Five Largest Secured Claims**

To the best of the Debtors' knowledge, belief, and understanding, the only creditor holding, as of the Petition Date, a secured, non-contingent claim against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101, is Goldman Sachs Specialty Lending Group, L.P., as Administrative Agent for various lenders.

**Schedule 4**

**Local Rule 1007-2(a)(6):  Condensed Consolidated Balance Sheet (Unaudited) as of**

**December 2017**


**See attached**

**Fortior Solutions**
HOLDCO Balance Sheet - ProForma: **COMBINED FS-IP LLC and AST Inc**
**Draft as of 10.26.17 - UPDATE AS OF 12.28.17**
Unconfirmed Starting Date

**Assumptions:**

Receives all assets and liabilities related to facial recognition (if any),
TSA (if any), blockchain (if any), and credentialing

PKI technology, vendor relationships, and payables goes with the Government
business, such that credentialing is just a printing bureau. Credentialing will not
manage PKI certs.

**Limitations:**

Assigns no value to IP held (eg, internally built software for queueing and
operating credentialing printers)

Records items at current book value. Book value may change before
transaction date. Fair value may also be the more appropriate
presentation, depending upon transaction type, applicable accounting
guidance, and purpose of use for this balance sheet.

**Balance Sheet**

Assets

| Current Assets | | | |
|---|---|---|---|
| Cash | TBD | | |
| Card Inventory | 447,539 | | |
| Card Mfg Supplies | 20,000 | | estimate |
| Total Current Assets | | 467,539 | |

| Fixed Assets | | | |
|---|---|---|---|
| Credentialing Printers | 112,311 | | |
| Misc Furn/Fixtures/Tech | 10,000 | | estimate |
| Less: Accumulated Depr | (91,118) | | |
| Total Fixed Assets | | 31,193 | |

| Other Assets | | - | |
|---|---|---|---|
| Total Assets | | 498,732 | |

Liabilities & Equity

| Current Liabilities | | | |
|---|---|---|---|
| Debt - GSSLG | 40,369,361 | | estimated |
| Total Current Liabilities | | 40,369,361 | |

| Long-Term Liabilities | | - | |
|---|---|---|---|
| Equity | | (39,870,629) | plug |
| Total Liabilities and Equity | | 498,732 | |

**<u>Schedule 5</u>**

**Local Rule 1007-2(a)(7):  The Debtors' Securities**

The Debtors do not have any shares of stock that are publicly traded and no shares of stock are owned by the Debtors' directors and officers.

**<u>Schedule 6</u>**

**Local Rule 1007-2(a)(8):  Debtors' Property Not in the Debtors' Possession**

To the best of the Debtors' knowledge and belief, no property of the Debtors is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

### Schedule 7

**Local Rule 1007-2(a)(9):  Premises Owned, Leased, Held Under Other Arrangement**

The Debtors do not own, lease or hold under other arrangement any premises from which the Debtors operate their businesses.  The Debtors, however, maintain their businesses at the Fortior's headquarters, located at 5800 NW Pinefarm Place, Hillsboro, Oregon 97124, in which Fortior is the direct tenant.

**Schedule 8**

**Local Rule 1007-2(a)(10):  Location of Debtors' Substantial Assets, Books and Records**

The Debtors' assets and books and records are maintained at Fortior's headquarters, located at 5800 NW Pinefarm Place, Hillsboro, Oregon 97124.  The Debtors do not own any substantial assets outside the United States.

**Schedule 9**

**Local Rule 1007-2(a)(11):  Litigation**

To the best of the Debtors' knowledge, belief and understanding, there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

## **Schedule 10**

### **Local Rule 1007-2(a)(12):  Senior Management**

The following chart provides the names of the individuals who comprise the Debtors'
existing senior management, a description of their tenure with the Debtors, and a brief summary
of their relevant responsibilities and experience:

| Names | Tenure | Responsibilities / Experience |
|---|---|---|
| James ("Jim") Robell | | AST:  Director, President, Chief Executive Officer<br>FS-IP:  Manager, Chief Executive Officer, President |
| Sean Sullivan | | AST:  Director, Vice President, Treasurer<br>FS-IP:  Manager, Vice President, Treasurer |
| Katherine Cowan | | AST:  Director, General Counsel, Secretary<br>FS-IP:  Manager, General Counsel, Secretary |

**<u>Schedule 11</u>**

**Local Rule 1007-2(b)(1)-2(A), (C):  Payroll**

The Debtors currently do not have any employees (not including officers, directors and stockholders) and do not expect to compensate any officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the Chapter 11 Cases.  Upon completion of the restructuring contemplated under the Plan, certain Fortior employees will transfer to AST, but historically the Debtors have not had any direct employees.

**<u>Schedule 12</u>**

**Local Rule 1007-2(b)(3):  Cash Receipts and Disbursements, Net Cash Gain or Loss,**

**Unpaid Obligations and Receivables**

For the 30-day period following the filing of the Chapter 11 Cases, the Debtors estimate cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, at $0.00.